UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JASON BELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:11CV 1303AGF(LMB) |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Jason Bell for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of Plaintiff's Complaint. (Document Number 13). Defendant has filed a Brief in Support of the Answer. (Doc. No. 16).

**Procedural History**

On September 22, 2006, plaintiff filed his application for benefits, claiming that he became unable to work due to his disabling condition on July 1, 2005. (Tr. 140). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated May 4, 2010. (Tr. 83-86, 10-18). Plaintiff then

filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on June 8, 2011. (Tr. 1-5). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on January 27, 2010. (Tr. 26). Plaintiff was present and was represented by counsel. (Id.). Also present was Gary Weimholt, vocational expert. (Id.).

The ALJ examined plaintiff, who testified that he was twenty-four years of age, and lived alone in an RV behind his parents' home. (Tr. 29). Plaintiff stated that he was six-feet tall and weighed 276 pounds. (Id.). Plaintiff testified that he was single, and had no children. (Id.).

Plaintiff stated that he had not driven in the past year-and-a-half. (Tr. 30). Plaintiff testified that he stopped driving because he did not "get along with other drivers very well." (Id.).

Plaintiff stated that he received food stamps in the amount of $200.00 a month. (Id.). Plaintiff testified that he received Medicaid benefits. (Id.). Plaintiff stated that he received unemployment benefits five to six years prior to the hearing. (Tr. 31).

Plaintiff testified that the highest grade he completed was ninth grade. (Id.). Plaintiff stated that he attended all special education classes when he was in school. (Id.). Plaintiff testified that he attempted to obtain his GED on multiple occasions but was unsuccessful. (Id.). Plaintiff stated that he also unsuccessfully attempted to receive vocational training through St.

Louis Job Corps.  (Id.).

Plaintiff testified that he was able to read "some."  (Tr. 32).

Plaintiff stated that he last worked in June 2008 as a cook at Sonic.  (Id.).  Plaintiff testified that he only worked at this position for three days, and was fired after missing work due to illness.  (Id.).

Plaintiff stated that he worked at Jack in the Box as a cook for a month.  (Tr. 33). Plaintiff testified that he was terminated from this position because he did not get along with his co-workers.  (Id.).

Plaintiff stated that he worked for a temp agency at a printing press for a month-and-a-half.  (Id.).  Plaintiff testified that he did not get along with co-workers, and lost focus frequently at this position.  (Id.).

Plaintiff stated that he worked for Paramount, a t-shirt company, laying out shirts for the machines.  (Tr. 34).

Plaintiff testified that the longest he has worked at a position is two months.  (Tr. 35).

Plaintiff stated that he has applied for cook positions since June 2008, but did not receive any job offers.  (Id.).

Plaintiff testified that, on a typical day, he wakes up around 2:00 to 3:00 p.m.  (Id.). Plaintiff stated that he usually goes back to sleep shortly after waking.  (Id.).  Plaintiff testified that he does not do much during the day other than sleep.  (Id.).  Plaintiff stated that he does not have a television in his RV, although he watches television occasionally inside his parents' home. (Id.).  Plaintiff testified that he has difficulty focusing long enough to watch a full television program.  (Tr. 36).  Plaintiff stated that he reads comic books occasionally.  (Id.).

Plaintiff testified that he microwaves leftover meals from his parents' home. (Id.). Plaintiff stated that he did not wash his own clothes, wash dishes, make his bed, change his sheets, vacuum, mop, sweep, or perform yard work, although he was physically able to perform these chores. (Id.). Plaintiff testified that he was unable to focus long enough to finish a task. (Id.). Plaintiff stated that his mother takes him to the grocery store and picks out his groceries. (Tr. 37). Plaintiff testified that he did not get along well with people at the grocery store. (Id.).

Plaintiff stated that he had two friends. (Tr. 38). Plaintiff testified that he saw these friends occasionally. (Id.). Plaintiff stated that he did not get along well with his parents. (Id.). Plaintiff testified that the only family member he got along well with was his sister, who had also been diagnosed with bipolar disorder. (Id.). Plaintiff stated that he was not active in any clubs or organizations. (Id.).

Plaintiff testified that he spent most of his days sleeping or lying in bed trying to clear his head. (Tr. 38-39). Plaintiff stated that he experienced frequent suicidal thoughts, and racing thoughts. (Tr. 39). Plaintiff testified that he occasionally played video games on his neighbor's computer. (Id.).

Plaintiff stated that he bathed regularly. (Tr. 40). Plaintiff testified that he did not smoke or drink. (Id.). Plaintiff stated that he experimented with marijuana when he was younger, but had not used it in six years. (Id.). Plaintiff testified that he stopped using marijuana because it caused him to hallucinate. (Id.).

Plaintiff stated that he took Abilify[1] and Depakote[2] to control his moods. (Tr. 41). Plaintiff testified that his dosage of Depakote was recently decreased because his doctor felt he was sleeping too much. (Tr. 42). Plaintiff stated that he had not slept in the forty-eight hours prior to the hearing. (Id.). Plaintiff testified that he alternated between periods of insomnia and hypersomnia. (Id.).

Plaintiff stated that he took medication for high blood pressure. (Tr. 41). Plaintiff testified that his blood pressure was still running high, and that it was 178/94 the day prior to the hearing. (Tr. 42).

Plaintiff stated that he had no physical problems other than high blood pressure. (Tr. 43).

Plaintiff testified that he was diagnosed with bipolar disorder.[3] (Id.). Plaintiff stated that his mother also has bipolar disorder. (Id.). Plaintiff testified that he experienced mood swings, racing thoughts, and difficulty getting along with others. (Id.). Plaintiff stated that his medication helped somewhat, but he still experienced these symptoms. (Id.). Plaintiff testified that he also suffered from symptoms of depression, including suicidal thoughts, oversleeping, and being unhappy (Tr. 44). Plaintiff stated that he did not experience crying spells, but often sits in a dark room and wallows. (Id.).

---

[1]Abilify is an antipsychotic drug indicated for the treatment of schizophrenia, bipolar disorder, and major depressive disorder. See Physician's Desk Reference (PDR), 881(63rd Ed. 2009).

[2]Depakote is indicated for the treatment of bipolar disorder, seizures, and migraine headaches. See PDR at 423.

[3]An affective disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depressive episodes. See Stedman's Medical Dictionary, 568 (28th Ed. 2006).

Plaintiff testified that he was admitted to a mental hospital when he was thirteen or fourteen due to anger issues. (Id.). Plaintiff stated that he received daily outpatient treatment for about two months. (Id.). Plaintiff testified that this treatment helped, although he still experienced anger issues. (Id.).

Plaintiff stated that he was being treated by Dr. Narsimha Muddasani at the time of the hearing. (Id.). Plaintiff testified that he saw Dr. Muddasani every two months. (Id.). Plaintiff stated that he did not see a counselor. (Tr. 45).

Plaintiff testified that he experienced suicidal thoughts two to three times a week. (Id.). Plaintiff stated that he had never made an attempt on his life. (Id.). Plaintiff testified that his concentration was very poor. (Id.). Plaintiff stated that he was diagnosed with ADD[4] as a child and still suffered from it. (Id.).

Plaintiff testified that he had no difficulty sitting, standing, or walking. (Id.). Plaintiff stated that he experienced some back pain when bending over, but had no difficulty stooping, crouching, kneeling, or crawling. (Tr. 45-46).

Plaintiff's attorney examined plaintiff, who testified that no one had ever suggested that he see a counselor. (Tr. 46).

Plaintiff stated that he had been awake for two days due to racing thoughts. (Id.). Plaintiff testified that he would be sleeping if he were at home. (Id.). Plaintiff stated that he often experienced difficulty sleeping. (Id.). Plaintiff testified that he felt "down" more often than he felt "up." (Id.). Plaintiff stated that he slept fifteen to eighteen hours straight in an average day. (Tr.

---

[4]Attention deficit disorder ("ADD") is a disorder of attention, organization, and impulse control appearing in childhood and often persisting to adulthood. Stedman's at 568.

47).

Plaintiff testified that he spent most of his days lying in bed thinking. (Tr. 47). Plaintiff stated that he had no hobbies other than playing video games occasionally. (Id.). Plaintiff testified that he was only able to stay focused on video games for about fifteen minutes. (Id.).

Plaintiff stated that he did not get along well with his parents, and frequently argued with them. (Tr. 48). Plaintiff testified that he lived in his parents' RV rather than their home because his father felt that they would get along better if they were not so close to each other. (Id.). Plaintiff stated that he only watched television in his parents' home during the day when his parents were working. (Id.). Plaintiff testified that he did not eat dinner with his parents. (Id.). Plaintiff stated that he ate leftovers from his parents' meals. (Id.).

Plaintiff testified that he experienced migraine headaches two to three times a week. (Tr. 49). Plaintiff stated that he only took over-the-counter medication for his migraines because his insurance would not cover any prescription medications. (Id.). Plaintiff testified that he had gone to the emergency room in the past for migraines. (Tr. 50). Plaintiff stated that light triggered his migraines, and that he tried to avoid going outdoors and covered his windows. (Tr. 53-54).

Plaintiff stated that his primary care doctor was Jennifer Barbin. (Id.). Plaintiff testified that he saw Dr. Barbin for back pain, high blood pressure, and any other concerns he had. (Tr. 51).

Plaintiff stated that he was recently approved to receive Medicaid benefits. (Id.). Plaintiff testified that he was without insurance from ages eighteen to twenty-three. (Id.). Plaintiff stated that he applied for jobs as a cook because he was told to find a way to support himself. (Tr. 52). Plaintiff testified that he did not really believe he was capable of working as a cook. (Id.).

Plaintiff stated that he did not get along well with co-workers in the past. (Id.). Plaintiff testified that he argued with co-workers over proper food preparation and personal issues. (Id.). Plaintiff stated that he was fired from all of his jobs except his job at the printing press. (Tr. 53). Plaintiff testified that he walked out at his job at the printing press because he lost focus and became interested in some outside activity. (Id.).

Plaintiff stated that, when he becomes frustrated and angry, he has punched walls, argued, and been involved in fistfights. (Id.). Plaintiff testified that he still occasionally engages in this type of behavior. (Id.).

Plaintiff stated that he visited with friends once or twice a month. (Id.). Plaintiff testified that he played video games with his friends. (Id.).

Plaintiff stated that he became paranoid easily. (Id.). Plaintiff testified that he felt that he was being watched and that something bad was going to happen. (Tr. 55).

Plaintiff stated that he spent a full day in bed approximately half of the time. (Id.). Plaintiff testified that, on a typical day, he only got out of bed to use the restroom and to eat. (Id.).

Plaintiff stated that he has had to leave the grocery store early because he got into an argument with his mother. (Id.).

Plaintiff testified that he felt tired most of the time when he was awake. (Id.). Plaintiff stated that he took frequent naps, which lasted three to four hours. (Tr. 56).

Plaintiff testified that he experienced difficulty concentrating when he read comic books, and only read a couple pages at a time. (Id.).

Plaintiff stated that his parents took care of his financial matters. (Id.). Plaintiff testified

that his father took him to doctor appointments.  (Id.).

Plaintiff stated that he attended all doctor appointments.  (Tr. 57).  Plaintiff testified that he usually only spent about five minutes talking with Dr. Muddasani in his office.  (Id.).

Plaintiff stated that he experienced mood swings.  (Tr. 58).  Plaintiff testified that his moods alternate between feeling fine, angry, paranoid, and depressed.  (Tr. 58).  Plaintiff stated that he preferred being alone because he becomes paranoid when he is around groups of people.  (Id.).  Plaintiff testified that he worried he would become involved in arguments and physical fights when he was around large groups of people.  (Id.).  Plaintiff stated that he was last in a physical fight a few years prior to the hearing.  (Id.).

Plaintiff testified that his mother often told him that he should be admitted to the psychiatric ward.  (Tr. 59).  Plaintiff stated that he has always had difficulty getting along with his mother, and that he got along better with his father.  (Id.).

The ALJ re-examined plaintiff, who testified that he occasionally experienced petit mal seizures, during which he stared blankly and forgot what he was doing prior to the seizure.  (Tr. 60).  Plaintiff stated that he was not taking medication for seizures.  (Id.).  Plaintiff agreed with the ALJ that it would not be a good idea to be standing on a ladder when he experienced a seizure.  (Id.).

The ALJ then examined the vocational expert, Gary Weimholt, who testified that plaintiff's past work was classified as fast food cook (medium in exertion); machine off bearer (light); and laborer (medium).  (Tr. 62-63).  Mr. Weimholt stated that plaintiff had not worked at any position for longer than two months.  (Tr. 63).

The ALJ asked Mr. Weimholt to assume a hypothetical individual with plaintiff's

background, no past relevant work, and the following limitations: no exposure to ladders, ropes, scaffolds, moving machinery, unprotected heights; limited to simple repetitive tasks and instructions; and only occasional interaction with supervisors, co-workers, and the public. (Tr. 64). Mr. Weimholt testified that the individual could perform work as a hand packager at the light or medium level (20,000 positions in Missouri); cleaning offices in the evening (6,000 positions in Missouri); and a dishwasher (10,000 positions in Missouri). (Tr. 65).

Plaintiff's attorney then examined Mr. Weimholt, who testified that the individual would be capable of performing the previously identified jobs if he were limited to no contact with the public and less than occasional contact with co-workers and supervisors. (Tr. 65-66).

Mr. Weimholt stated that the individual would be capable of performing the previously identified jobs if he were limited to no changes in routine. (Tr. 66).

Mr. Weimholt testified that an individual who required constant supervision to stay on task would be unable to perform the jobs he identified. (Id.).

Mr. Weimholt stated that an individual who was on task less than eighty percent of the day would be unable to perform the jobs he identified. (Id.).

Mr. Weimholt testified that an individual who was unable to complete his regular work in a regular work period would be unable to perform the jobs he identified. (Tr. 67).

Mr. Weimholt stated that an individual who was either late, had to leave early, or had to take an extra break at least once a week would be unable to maintain the jobs he identified. (Id.). Mr. Weimholt testified that an individual who had three unscheduled work absences a month would be unable to maintain the identified jobs. (Id.).

The ALJ indicated that he would order a psychological examination due to the fact that

- 10 -

plaintiff had not undergone a psychological examination since 2006. (Tr. 68). Plaintiff's attorney stated that he would submit additional medical records from Dr. Muddasani. (Id.).

**B.**     **Relevant Medical Records**

The record reveals that plaintiff was diagnosed with absence seizures[5] and a possible attention deficit disorder as a child. (Tr. 268). In August of 1998, when plaintiff was twelve years old, pediatric neurologist Suresh Kotagal, M.D. noted that plaintiff had been seizure free with medication for about eighteen months. (Id.). In February of 2001, neurologist Alma Bicknese, M.D. indicated that plaintiff had intractable adolescent absence seizures, and that plaintiff had a good chance of stopping his medications when he was in his 20s. (Tr. 459). Dr. Bicknese encouraged plaintiff to continue taking his seizure medications as prescribed. (Id.). Dr. Bicknese also increased plaintiff's dosage of Adderall[6] due to increased distractibility when doing his school work. (Id.).

On September 4, 2002, plaintiff's mother reported that plaintiff was in a regimented residential unit for kids with behavior disorders. (Tr. 421). Plaintiff's mother indicated that she had taken plaintiff off of his seizure medication, and that plaintiff had been having problems with seizures again. (Id.). Robert M. Patterson, D.O. advised plaintiff's mother that she should not attempt to wean plaintiff off his medication again. (Id.). Dr. Patterson started plaintiff back on his seizure medication. (Id.).

---

[5]Seizures characterized by impaired awareness of interaction with, or memory of, ongoing events external or internal to the person; may comprise the following elements: mental confusion, diminished awareness of environments, inability to respond to internal or external stimuli, and amnesia. Stedman's at 1743.

[6]Adderall is indicated for the treatment of ADHD. See PDR at 3013.

On July 29, 2003, plaintiff reported that he was not taking his seizure medication. (Tr. 418). Plaintiff had also run out of Adderall. (Id.). Dr. Patterson stated that plaintiff's greatest problem was with depression, and noted that plaintiff seemed to be angry and depressed a lot. (Id.). Dr. Patterson restarted plaintiff's seizure medication, and prescribed Lexapro.[7] (Id.).

Plaintiff presented to Kenneth G. Mayfield, Licensed Psychologist, on October 11, 2006, for a psychological evaluation. (Tr. 309-11). Dr. Mayfield noted that plaintiff's reliability as historian and informant proved highly questionable. (Tr. 309). Plaintiff expressed great bitterness toward his parents, and reported that he was kicked out at the age of thirteen, although Dr. Mayfield noted that records revealed that plaintiff was still living at home in February 2001. (Id.). Dr. Mayfield stated that rapport with plaintiff was minimal from onset of contact and plaintiff's efforts to control and manipulate became patently obvious as contact extended. (Tr. 310). Dr. Mayfield stated that, when introduced to formal assessment, plaintiff immediately attempted to present himself as intellectually limited and, on one occasion, seemed to be faking an absence-type seizure. (Id.). Dr. Mayfield noted that efforts to gain cooperation proved futile. (Id.). Dr. Mayfield found that the results of intelligence testing were invalid and probably the result of active malingering. (Tr. 311). Dr. Mayfield stated that, after plaintiff's "dismal response to cognitive assessment, it was determined that attempts toward further evaluation would prove futile and the assessment was terminated." (Id.). Dr. Mayfield diagnosed plaintiff with malingering, and assessed a GAF[8] score of 70.[9] (Id.). Dr. Mayfield stated that plaintiff's level of daily functioning

---

[7]Lexapro is indicated for the treatment of major depressive disorder and generalized anxiety disorder. See PDR at 1174-75.

[8]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a

revealed that plaintiff's ability to relate to others appeared electively intact, and that no marked

constriction of interests or activities was indicated. (Id.). Dr. Mayfield found that plaintiff was

able to care for basic personal needs, and understand and follow simple verbal directions. (Id.).

Dr. Mayfield stated that plaintiff proved uncooperative and manipulative during his examination.

(Id.).

Marsha Toll, Psy.D., a state agency psychologist, completed a Psychiatric Review

Technique on December 29, 2008. (Tr. 327-37). Dr. Toll expressed the opinion that plaintiff's

mental impairments were not severe and caused only mild difficulties in maintaining concentration,

persistence, or pace. (Tr. 335).

Plaintiff presented to Narsimha R. Muddasani, M.D. on February 2, 2009, for an initial

psychiatric evaluation. (Tr. 342-43). Plaintiff's mood was described as euthymic, and his thought

process was coherent, logical, and goal-directed. (Tr. 343). Dr. Muddasani diagnosed plaintiff

with bipolar disorder[10] and ADHD,[11] and assessed a GAF score of 65. (Id.). He prescribed

---

hypothetical continuum of mental health-illness" which does "not include impairment in
functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of
Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[9]A GAF score of 61 to 70 denotes "[s]ome mild symptoms (e.g., depressed mood and mild
insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional
truancy, or theft within the household), but generally functioning pretty well, has some meaningful
interpersonal relationships." DSM-IV at 32.

[10]Dr. Muddasani's hand-written treatment notes are difficult to read, but the diagnosis
appears to be "bipolar disorder." (Tr. 343).

[11]Attention deficit hyperactivity disorder ("ADHD") is a behavioral disorder manifested by
developmentally inappropriate degrees of inattentiveness (short attention span, distractability,
inability to complete tasks, difficulty in following directions), impulsiveness (acting without due
reflection), and hyperactivity (restlessness, fidgeting, squirming). Stedman's at 568.

Depakote and Abilify.  (Id.).  Plaintiff saw Dr. Muddasani for follow-up in March 2009, May 2009, June 2009, August 2009, November 2009, and January 2010.  (Tr. 360-65).  Plaintiff reported difficulty sleeping and concentrating.  (Id.).

Plaintiff presented to Jennifer Barbin, M.D. on May 19, 2009, for a follow-up regarding hypertension and bipolar disorder.  (Tr. 346).  Dr. Barbin found that plaintiff's bipolar disorder was controlled with medication.  (Id.).  Dr. Barbin diagnosed plaintiff with chronic hypertension, which was controlled.  (Tr. 347).  On September 1, 2009, plaintiff complained of migraines, which were aggravated by bright lights.  (Tr. 344).  Dr. Barbin diagnosed plaintiff with migraines and hypertension.  (Tr. 345).  Dr. Barbin started plaintiff on a trial of Treximet[12] for his migraines. (Id.).

Plaintiff presented to Lauretta V. Walker, Ph.D., Clinical Psychologist, on March 15, 2010, for a psychological evaluation.  (Tr. 484-86).  Plaintiff reported that he had not liked any of his past jobs and never felt comfortable in any job.  (Tr. 485).  Plaintiff indicated that he did not like to be told what to do.  (Id.).  Upon mental status examination, Dr. Walker noted that plaintiff presented with a "somewhat nonchalant, challenging manner" and several times asked how Dr. Walker would diagnose him.  (Id.).  Dr. Walker estimated plaintiff's intelligence to be close to average.  (Tr. 486).  Dr. Walker diagnosed plaintiff with occupational problems, mood disorder

---

[12]Treximet is indicated for the treatment of migraine headaches.  See PDR at 1617.

NOS,[13] personality disorder NOS,[14] and assessed a GAF score of 65-70. (Id.). Dr. Walker stated "[o]bviously this man has an Occupational Problem but I do not think it is related to an Axis I[15] diagnosis." (Id.). Dr. Walker indicated that it was difficult to decide on an Axis I diagnosis and plaintiff's primary diagnosis was clearly the Axis II one. (Id.). Dr. Walker stated that there were some symptoms of depression, but she did not see symptoms that put plaintiff in a full bipolar category. (Id.). Dr. Walker indicated that she had "some question as to the veracity of [plaintiff's] presentation but he was not trying to malinger to the point that he did with [Dr.] Mayfield." (Id.). Dr. Walker found that plaintiff was able to understand and follow directions, and make decisions. (Id.). Finally, Dr. Walker indicated that plaintiff was able to handle his own funds, although his overall judgment was probably poor. (Id.).

Dr. Walker completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental). (Tr. 481-83). Dr. Walker expressed the opinion that plaintiff had no limitations in his ability to understand, remember, and carry out instructions. (Tr. 481). Dr. Walker found that plaintiff had marked limitations in his ability to interact appropriately with the

---

[13]This category includes disorders with mood symptoms that do not meet the criteria for any specific Mood Disorder and in which it is difficult to choose between Depressive Disorder Not Otherwise Specified and Bipolar Disorder Not Otherwise Specified. DSM-IV at 375.

[14]This category is for disorders of personality functioning that do not meet criteria for any specific Personality Disorder. DSM-IV at 673.

[15]The DSM-IV multiaxial system involves an assessment on several axes, each of which refers to a different domain of information that may help the clinician plan treatment and predict outcome. There are five axes included in the DSM-IV multiaxial classification: (1) Axis I: Clinical Disorders, Other Conditions That May Be a Focus of Clinical Attention; (2) Axis II: Personality Disorders, Mental Retardation; (3) Axis III: General Medical Conditions; (4) Axis IV: Psychosocial and Environmental Problems; and (5) Axis V: Global Assessment of Functioning. DSM-IV at 25.

public, supervisors, co-workers; and respond appropriately to usual work situations and changes in a routine work setting due to his Axis II diagnosis.  (Id.).


**C.      Relevant School Records**

Plaintiff underwent intelligence testing administered by St. Clair High School on March 4, 1999, which revealed a Verbal IQ of 95, a Performance IQ of 75, and a Full Scale IQ of 84.  (Tr. 242).  These scores indicated that plaintiff was functioning in the low average range of intelligence, with verbal skills falling in the average range of intelligence, and performance skills falling in the borderline range of intelligence.  (Id.).  It was concluded that plaintiff continued to meet the eligibility criteria to be classified as Other Health Impaired.  (Tr. 250).  It was noted that plaintiff had been diagnosed with petit mal seizures and ADHD, which interfered with his ability to function in an educational program using traditional materials or techniques.  (Id.).  It was felt that plaintiff's academic performance was significantly impacted by his medical diagnosis.  (Id.).  Plaintiff's strengths were listed as: oral expression, listening comprehension, pleasant and polite, outgoing personality, and desire to help others.  (Id.).  His weaknesses were listed as: basic reading skills, spelling skills, numerical operations, social skills, and attention.  (Tr. 251).

**The ALJ's Determination**

The ALJ made the following findings:

1.      The claimant met the special earnings requirements of the Act as of June 15, 2008, the alleged onset of disability, and continues to meet them through the date of this decision.

2.      The claimant has not engaged in substantial gainful activity since June 15, 2008.

3.      The medical evidence establishes that the claimant has a seizure disorder, migraine

headaches and hypertension controlled by medication, and a possible bipolar disorder controlled by medication, but no impairment or combination of impairments that meets or equals in severity the requirements of any impairment listed in Appendix 1, Subpart P, Regulations No. 4.

4.    The claimant's allegation of impairments, either singly or in combination, producing symptoms and limitations of sufficient severity to prevent the performance of any sustained work activity is not credible, for the reasons set out in the body of this decision.

5.    The claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work except for climbing of ropes, ladders, or scaffolds, working at unprotected heights or around dangerous moving machinery, doing more than simple, repetitive unskilled tasks, or having close or frequent contact with co-workers, supervisors or the general public (20 CFR 404.1545 and 416.945).

6.    The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant's residual functional capacity for the full range of exertional work is reduced by the limitations described in Finding No. 5.

8.    The claimant is 24 years old, defined as a younger individual (20 CFR 404.1563 and 416.963).

9.    The claimant has a ninth grade limited education, but is literate and able to communicate in English (20 CFR 404.1564 and 416.964).

10.   The claimant has no acquired or usable skills transferable to the skilled or semi-skilled functions of other work (20 CFR 404.1568 and 416.968).

11.   Based on an exertional functional capacity for unlimited exertional work, and the claimant's age and education, 20 CFR 404.1569 and 416.969 and Section 204.00, Appendix 2, Subpart P, Regulation No. 4 would direct a conclusion of "not disabled."

12.   Although the claimant's limitations do not allow the performance of the full range of work, there is, using the above-cited Rule as a framework for decision-making, a significant number of jobs in the local and national economies which the claimant could perform.  Examples of such jobs are any of a total of about 36,000 unskilled jobs in the State of Missouri and about 50 times that many jobs nationwide as a hand packager, office cleaner, and dishwasher, according to vocational expert opinion.

13.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 16-17).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based upon the applications filed on November 20, 2008, the claimant is not entitled to a period of disability or to disability insurance benefits under Sections 216(I) and 223, respectively, of the Social Security Act; and is not eligible for supplemental security income under Sections 1602 and 1614(a)(3)(A) of the Act.

(Tr. 17).

## Discussion

### A.     Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141

F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."
Id.


**B.**     **The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of

not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant

has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d

598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a

person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-

42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895

(8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial

gainful employment."  If the claimant is, disability benefits must be denied.

See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the

claimant suffers from a medically severe impairment or combination of impairments.

 See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must

significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age,

education and work experience of a claimant are not considered in making the "severity"

determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of

the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard report entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's

decision, although this is no longer required. <u>See</u> 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000). Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. <u>See</u> 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. <u>See</u> 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. <u>See</u> 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. <u>See</u> <u>id.</u> Next, the Commissioner must determine the severity of the impairment based on those ratings. <u>See</u> 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. <u>See</u> 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. <u>See</u> <u>id.</u> If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual

functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Pratt, 956 F.2d at 834-35; Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

## C.    Plaintiff's Claims

Plaintiff first argues that the ALJ erred in weighing the medical opinion evidence.  Plaintiff next argues that the ALJ erred in failing to obtain vocational expert testimony following the post-hearing consultative examination.  The undersigned will discuss plaintiff's claims in turn.

## 1.    Medical Opinion Evidence

Plaintiff argues that, in determining plaintiff's RFC, the ALJ failed to properly weigh the medical opinion evidence.  Specifically, plaintiff contends that the ALJ ignored the opinions of post-hearing consultative examiner Dr. Walker and treating psychiatrist Dr. Muddasani.

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'"  Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)).  "Ordinarily, a treating physician's opinion should be given substantial weight."  Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)).  Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original).  Such opinions, however, do "not automatically control, since the record must be evaluated as a whole."  Id. at 1013 (quoting Bentley, 52 F.3d at 785-786).  Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more

- 22 -

thorough medical evidence.'" <u>Id.</u> (quoting <u>Rogers v. Chater</u>, 118 F.3d 600, 602 (8th Cir. 1997)).

Whatever weight the ALJ accords the treating physician's report, be it substantial or little, the ALJ is required to give good reasons for the particular weight given the report. <u>See Holmstrom v. Massanari</u>, 270 F.3d 715, 720 (8th Cir. 2001). The ALJ, however, is not required to discuss every piece of evidence submitted. <u>See Morrison v. Apfel</u>, 146 F.3d 625, 628 (8th Cir. 1998). If the opinion of a treating physician is not well supported or is inconsistent with other evidence, the ALJ must consider: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by the relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered, and (6) other factors which may contradict or support the opinion. <u>See Rhodes</u>, 40 F. Supp.2d at 1119; 20 C.F.R. § 404.1527 (d)(2)-(6).

Plaintiff argues that the ALJ ignored the opinions of Drs. Muddasani and Walker in finding that plaintiff did not have a credible mental disorder. The ALJ did not, however, find that plaintiff did not have a credible mental disorder. Rather, the ALJ found that plaintiff's possible bipolar disorder was a severe medically determinable impairment. (Tr. 16). The ALJ then found that plaintiff did not have a "credible mental or mood disorder *that would prevent him from doing any number of ordinary jobs, especially the unskilled jobs identified by the vocational expert.*" (Tr. 15) (emphasis added). The undersigned finds that the ALJ properly analyzed the medical opinion evidence in making this determination.

Dr. Muddasani was plaintiff's treating psychiatrist beginning in February of 2009. (Tr.

342-43). At that time, Dr. Muddasani diagnosed plaintiff with bipolar disorder, with a GAF score of 65. (Tr. 343). Plaintiff saw Dr. Muddasani for follow-up regularly through January 2010. Dr. Muddasani noted plaintiff's reports of difficulty sleeping and concentrating. (Tr. 360-65). Dr. Muddasani consistently found that plaintiff's mood was euthymic, and that plaintiff's thought process was coherent. (Id.). Dr. Muddasani prescribed medications for plaintiff's mental impairments, including Depakote and Abilify. (Id.).

Plaintiff saw Clinical Psychologist Dr. Walker for a post-hearing psychological evaluation on March 15, 2010. (Tr. 484-86). Upon mental status examination, Dr. Walker noted that plaintiff presented with a "somewhat nonchalant, challenging manner" and several times asked how Dr. Walker would diagnose him. (Tr. 485). Dr. Walker diagnosed plaintiff with occupational problems, mood disorder NOS, personality disorder NOS, and assessed a GAF score of 65-70. (Id.). Dr. Walker stated "[o]bviously this man has an Occupational Problem but I do not think it is related to an Axis I diagnosis." (Id.). Dr. Walker indicated that it was difficult to decide on an Axis I diagnosis and plaintiff's primary diagnosis was clearly the Axis II one. (Id.). Dr. Walker stated that there were some symptoms of depression, but she did not see symptoms that put plaintiff in a full bipolar category. (Id.). Dr. Walker indicated that she had "some question as to the veracity of [plaintiff's] presentation but he was not trying to malinger to the point that he did with [Dr.] Mayfield." (Id.). Dr. Walker found that plaintiff was able to understand and follow directions, and make decisions. (Id.). Dr. Walker expressed the opinion that plaintiff had no limitations in his ability to understand, remember, and carry out instructions. (Tr. 481). Dr. Walker found that plaintiff had marked limitations in his ability to interact appropriately with the public, supervisors, co-workers; and respond appropriately to usual work

situations and changes in a routine work setting due to his Axis II diagnosis. (Id.).

With regard to Dr. Muddasani, the ALJ noted that, even at the outset of treatment in February 2009, Dr. Muddasani assessed a GAF score of 65, indicating only mild to borderline moderate difficulty with social and occupational functioning. (Tr. 13, 343). The ALJ indicated that Dr. Muddasani saw plaintiff about once every one to two months after this date, through January 2010. (Tr. 13). The ALJ pointed out that Dr. Muddasani consistently found that plaintiff's mood was stable and his speech was coherent. (Tr. 13, 343, 360-65). The ALJ, therefore, did not ignore Dr. Muddasani's records. Rather, the ALJ properly summarized and analyzed Dr. Muddasani's records.

The ALJ also discussed the report of consultative psychologist Dr. Walker. The ALJ noted that Dr. Walker diagnosed a mood disorder not otherwise specified, with a mildly restrictive GAF of 65-70, and found that plaintiff had marked restrictions in his ability to get along normally with other people and handle normal work stress and adjustments. (Tr. 13, 486, 481). The ALJ pointed out that Dr. Walker also found that plaintiff's veracity was questionable, although he did not malinger as much as he did when he saw Dr. Mayfield. (Tr. 13, 486). The ALJ noted that Dr. Walker indicated that plaintiff's main problem was an "occupational problem." (Tr. 13, 486). The ALJ stated that Dr. Walker found that there was insufficient evidence to make a firm diagnosis of a true mental disorder, and imposed limitations based on a "vague 'occupational problem.'" (Tr. 15).

The ALJ's statement that Dr. Walker imposed limitations based solely on plaintiff's "occupational problem" is inaccurate. Dr. Walker did indicate that plaintiff's occupational problem was unrelated to his mood disorder. (Tr. 486). Dr. Walker, however, also diagnosed

plaintiff with personality disorder not otherwise specified, and stated that the assessed limitations resulted from this diagnosis. (Tr. 486, 482). The undersigned finds that the ALJ's error was harmless. The limitations found by Dr. Walker were inconsistent with her report and the remainder of the medical record. Further, as will be discussed below, even if the ALJ had adopted all of the limitations found by Dr. Walker, these limitations would not preclude plaintiff's ability to perform work existing in the national economy.

After discussing all of the medical evidence, the ALJ found that, if plaintiff had a bipolar disorder as found by Dr. Muddasani, it has been well-controlled with medication. (Tr. 15). This finding is supported by Dr. Muddasani's own records, as discussed above. It is also supported by the records of plaintiff's treating physician Dr. Barbin, who found on May 19, 2009 that plaintiff's bipolar disorder was controlled. (Tr. 346).

The ALJ made the following determination regarding plaintiff's RFC:

> The claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work except for climbing of ropes, ladders, or scaffolds, working at unprotected heights or around dangerous moving machinery, doing more than simple, repetitive unskilled tasks, or having close or frequent contact with co-workers, supervisors or the general public (20 CFR 404.1545 and 416.945).

(Tr. 26).

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating

physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

The RFC formulated by the ALJ is supported by substantial evidence in the record as a whole. Plaintiff does not dispute the ALJ's physical RFC. The ALJ's mental RFC determination is supported by the medical evidence of record. As discussed above, the ALJ properly weighed the medical opinion evidence. The ALJ's determination is supported by the opinion of Dr. Mayfield, who found that plaintiff's ability to relate to others was intact, and that plaintiff was able to understand and follow simple verbal instructions. (Tr. 311). State agency psychologist Dr. Toll found that plaintiff's mental impairments were not severe, and caused only mild difficulties in maintaining concentration, persistence, or pace. (Tr. 335). The GAF score assessed by treating psychiatrist Dr. Muddasani indicate only mild limitations. (Tr. 343). Plaintiff's treating physician Dr. Barbin indicated that plaintiff's bipolar disorder was controlled with medication. (Tr. 346). Finally, Dr. Walker found that plaintiff had no limitations in his ability to understand, remember, and carry out instructions. (Tr. 481).

In determining plaintiff's RFC, the ALJ also performed a proper credibility analysis. Most significantly, the ALJ noted that Dr. Mayfield found that plaintiff was malingering. (Tr. 13). Dr. Mayfield stated that plaintiff's efforts to control and manipulate became patently obvious as contact extended, plaintiff immediately attempted to present himself as intellectually limited, and plaintiff appeared to fake an absence-type seizure. (Tr. 310). Dr. Mayfield found that the results of intelligence testing were invalid and probably the result of active malingering. (Tr. 311). Dr. Mayfield diagnosed plaintiff with malingering. (Id.). In addition, Dr. Walker noted that she had

"some question as to the veracity of [plaintiff's] presentation but he was not trying to malinger to the point that he did with [Dr.] Mayfield." (Tr. 486). The ALJ was entitled to draw conclusions about plaintiff's credibility based on Dr. Mayfield's diagnosis, supported by his observations on examination, that plaintiff was malingering. See Jones v. Astrue, 619 F.3d 963, 973 (8th Cir. 2010).

The ALJ noted that plaintiff's work history was sparse and his earnings were low. (Tr. 12, 13). Although not controlling on the issue of plaintiff's complaints of disabling pain, a claimant's work history is a proper factor in assessing credibility. See Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996). A poor work history prior to the alleged onset of disability lessens the credibility of a plaintiff's allegations of disabling pain. See Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993). As such, the ALJ properly cited plaintiff's poor work history as one factor detracting from his credibility.

The ALJ also stated that plaintiff displayed no obvious signs of depression, anxiety, memory loss, or other mental disturbance at the hearing. (Tr. 15). "While the ALJ's observations cannot be the sole basis for his decision, it is not an error to include his observations as one of several factors." Lamp v. Astrue, 531 F.3d 629, 632 (8th Cir. 2008). The ALJ properly considered plaintiff's demeanor at the hearing in determining plaintiff's credibility.

In sum, the ALJ properly weighed the medical opinion evidence of record, properly determined the credibility of plaintiff's subjective complaints of pain and limitation, and formulated an RFC that is supported by substantial evidence in the record as a whole. Accordingly, the undersigned recommends that the decision of the Commissioner be affirmed as to this point.

## 2.     Vocational Expert Testimony

Plaintiff argues that the ALJ erred in erred in failing to obtain vocational expert testimony following the post-hearing consultative examination.  Plaintiff contends that Dr. Walker found that plaintiff had marked restrictions in several areas, and an individual with such limitations would be unable to maintain any type of employment.

The ALJ posed a hypothetical to the vocational expert, Gary Weimholt, consistent with the ALJ's RFC determination.  (Tr. 64).  Mr. Weimholt testified that the individual could perform work as a hand packager, office cleaner, and dishwasher.  (Tr. 65).

"A vocational expert's testimony constitutes substantial evidence when it is based on a hypothetical that accounts for all of the claimant's proven impairments."  Hulsey v. Astrue, 622 F.3d 917, 922 (8th Cir. 2010).  The undersigned has found that the RFC formulated by the ALJ is supported by substantial evidence in the record was a whole.  As such, the vocational expert's testimony based on this RFC is also supported by substantial evidence.

Plaintiff argues that the ALJ erred in failing to obtain vocational expert testimony following the post-hearing consultative examination because Dr. Walker found that plaintiff had marked restrictions in his ability to interact appropriately with the public, supervisors, and co-workers; and respond appropriately to usual work situations and changes in a routine work setting.  (Tr. 481).  Plaintiff's argument lacks merit.  First, as previously discussed, the ALJ found that these limitations were not credible.  Second, Mr. Weimholt testified that a hypothetical individual would be capable of performing the previously identified jobs if he were limited to no contact with the public, less than occasional contact with co-workers and supervisors, and no

changes in routine.  (Tr. 65-66).  As such, even if the ALJ had adopted all of the limitations found by Dr. Walker, plaintiff would still be capable of performing work existing in the national economy.

Accordingly, the undersigned recommends that the decision of the Commissioner be affirmed.


## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act be **affirmed**.


The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).


Dated this __19th__ day of June, 2012.

Lewis M. Blanton
_____
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE